

**SO ORDERED.**

**SIGNED this 27 day of May, 2011.**

_____
ROBERT E. NUGENT
UNITED STATES CHIEF BANKRUPTCY JUDGE
_____

OPINION DESIGNATED FOR ON - LINE PUBLICATION
BUT NOT PRINT PUBLICATION

### IN THE UNITED STATES BANKRUPTCY COURT
### FOR THE DISTRICT OF KANSAS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| SCOTTY WILSON, | ) | Case No. 09-10375 |
| | ) | Chapter 7 |
| Debtor. | ) | |
| _____ | ) | |
| CARL B. DAVIS, TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | Adversary No. 10-5035 |
| | ) | |
| HERITAGE BANK, | ) | |
| KAW VALLEY STATE BANK, | ) | |
| SCOTTY WILSON, EMMA WILSON, | ) | |
| and WILL WILSON | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

IN RE:                                                    )

-1-

| | | |
|---|---|---|
| S. WILSON ENTERPRISES, INC. | ) | **Case No. 09-13250** |
| | ) | **Chapter 7** |
| Debtor. | ) | |
| _____ | ) | |
| CARL B. DAVIS, TRUSTEE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **Adversary No. 10-5036** |
| | ) | |
| HERITAGE BANK, | ) | |
| KAW VALLEY STATE BANK, | ) | |
| SCOTTY WILSON, EMMA WILSON, | ) | |
| and WILL WILSON | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

### ORDER GRANTING IN PART DEFENDANTS' EMMA WILSON AND WILL WILSON MOTION FOR SUMMARY JUDGMENT

Defendants Emma and Will Wilson (collectively "the Wilsons") move for summary judgment on the Trustee's Complaint to avoid and preserve certain liens of Heritage Bank ("Bank") for the estate under 11 U.S.C. § 544, to avoid certain transfers to the Bank, Will, and Emma under 11 U.S.C. §§ 547, 548 & 549,[1] and to recover property of the estate not previously identified as assets of Scotty Wilson and S. Wilson Enterprises ("SWE").[2] The Trustee claims that the three Wilsons operate as a joint venture and that some of the property in Emma and Will's possession was in fact property in which Scotty's and SWE's estates have an interest. The Wilsons also seek

---

[1] The Trustee's § 549 claim related to the Springer motorcycle that Scotty allegedly transferred to Will. The controversy concerning the motorcycle has been resolved by compromise, *see* Case No. 09-10375, dkt. 358.

[2] Dkts. 95 and 96 in Adv. No. 10-0535; Dkts. 89 and 90 in Adv. No. 10-0536

-2-

summary judgment on the Bank's cross-claim that Scotty, Will, and Emma in fact operate a family business enterprise or joint venture and that the Bank's liens legally attach to property that is in Will and Emma's possession, but which Scotty or SWE actually owns in whole or in part by virtue of the joint venture. After careful review of the pleadings, the Court is prepared to rule.

### Background

Scotty Wilson ("Scotty") filed this bankruptcy case in chapter 13 on February 19, 2009. He converted it to chapter 11 on September 2, 2009 and then to chapter 7 on November 18, 2009. S. Wilson Enterprises ("SWE") filed its chapter 11 case on October 1, 2009 and converted that petition to chapter 7 on November 19, 2009. Scotty and Will Wilson are brothers and their mother is Emma. Before his death, Emma's husband, Bill, ran a business called Wilson Enterprises. Bill collected scrap metal, vehicles and farm equipment. He also farmed and excavated. Bill died in 2001, leaving all of his assets to Emma.

Scotty formed SWE in 1998. The Bank loaned money to Scotty, SWE, and a non-bankrupt entity, S. Wilson Recycled Products LLC ("SWRP"). SWE and SWRP each published financial statements authored by Scotty that suggest that Scotty, Will, and Emma each hold offices in them. Moreover, the documents filed in support of the Bank's proof of claim suggest that the Bank holds some entity's guaranties of these debts, though no copies of those documents are to be found in the record. After Scotty and SWE filed their bankruptcy petitions here, the Trustee sought to avoid the Bank's security interests in the personal property now in dispute and made the further claim that some of the property in Emma and Will's possession was in fact property in which Scotty's and SWE's estates had an interest. The Trustee also claims that the three Wilsons operate as a joint venture. The Bank filed a cross-claim in which it sought a declaratory judgment that Scotty, Will,

and Emma operate a family business enterprise that is a joint venture and that the Bank's liens legally attach to property that is in Will and Emma's possession, but which Scotty or SWE actually own in whole or in part. There appear to be several hundred pieces of equipment and rolling stock as well as a scrap yard of parts that, according to the Bank, is visible from the air. Emma and Will claim to own a line of equipment that consists of trailers, vehicles, and excavation equipment that is theirs exclusive of any claim by Scotty. Scotty gave various written statements to the Bank in which he claims either an interest in this property or the right to pledge the property as collateral for his loans.

The Trustee's and the Bank's claims place virtually all of Emma and Will's equipment (and ultimately, all of their business assets) in the cross-hairs. In an attempt to clarify that they own this equipment in their own right and without regard to Scotty, Emma and Will filed this motion for summary judgment. They address their property, item by item, yielding 1,309 separate factual allegations about how they acquired and used the various pieces of equipment in controversy. They claim to own a line of equipment that consists of trailers, vehicles, and excavation equipment that is theirs exclusive of any claim by Scotty. Their ownership claim is at odds with Scotty's written statements to the Bank. The Wilsons' motion, with exhibits, is some 300 pages in length. The Bank's response surpasses 550 pages.[3] The Trustee's response is a mere 93 pages in length.[4] The Wilsons' replies are another 40 pages.[5] The Court has reviewed these contentions and controversions and, after hearing oral argument on May 12, 2011 and rendering a partial oral

---

[3] Dkt. 100, Adv. No. 10-5035.

[4] Dkt. 99, Adv. No. 10-5035.

[5] Dkt. 102, 105, Adv. No. 10-5035.

-4-

decision at that time, makes the following findings of fact and conclusions of law that will control, and hopefully limit, the further trajectory of this case.

### *Summary Judgment Standards*

Federal Rule Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "shows that there is no genuine dispute as to any material fact and that the movant is entitled to a judgment as a matter of law."[6] The Court's function in reviewing a motion for summary judgment is to first determine whether genuine disputes as to material facts exist for trial. In making this determination, the Court may not weigh the evidence nor resolve fact issues.[7] The Court must construe the record in a light most favorable to the party opposing the summary judgment.[8]

Once the Court determines which facts are not in dispute, it must then determine whether those uncontroverted facts establish a sufficient legal basis upon which to grant movant judgment as a matter of law.[9] If different ultimate inferences may properly be drawn from the facts, summary

---

[6] All future references to "Rule" will refer to the Federal Rules of Civil Procedure, which apply to adversary proceedings under Federal Rule Bankruptcy Procedure 7001, *et seq.,* unless otherwise noted. Before December 1, 2010, Rule 56 provided that summary judgment should be rendered if there is *"no genuine issue as to any material fact* and that the movant is entitled to judgment as a matter of law."

[7] *First Sec. Bank of New Mexico, N.A. v. Pan Am. Bank*, 215 F.3d 1147, 1154 (10th Cir. 2000) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)); *Concrete Works of Colo., Inc. v. City and County of Denver*, 36 F.3d 1513, 1518 (10th Cir. 1994) (Court may not resolve disputed questions of fact at the summary judgment stage).

[8] *McKibben v. Chubb*, 840 F.2d 1525, 1528 (10th Cir. 1988) (citation omitted).

[9] *E.E.O.C. v. Lady Baltimore Foods, Inc.*, 643 F.Supp. 406, 407 (D. Kan. 1986) (Even if there are no genuine issue of material fact, the movant still has the burden to show it is entitled to judgment as a matter of law.).

-5-

judgment is not appropriate.[10]

### Uncontroverted Facts

A few general comments about the factual predicate underlying the Wilsons' motion are in order. First, their motion relies to a great extent on the affidavits of Scotty and Will. Prior to deciding this motion, the Court carefully scrutinized these affidavits in connection with the Trustee's motion to sell the Springer motorcycle, a matter that is now the subject of a compromise motion. Will based his opposition to the sale of the bike on facts gleaned from Scotty's affidavit. For the reasons set out below, Scotty's affidavit is a sham that will be stricken.

On all three versions of the bankruptcy Schedule B that Scotty signed and filed under penalty of perjury, he claimed to own the Springer. In addition, in Scotty's chapter 13 plan, he stated his intent to retain the Springer and repay part of a loan from the Bank that was allegedly secured by a lien on it (more on this below). In Scotty's Statement of Financial Affairs (also signed under penalty of perjury), he answered Question 10 ("Other Transfers"), but no mention was made of any sale or transfer of the Springer within the 2 years preceding the filing.

Notwithstanding that he took a contradictory position in his schedules,[11] his statement of financial affairs, his plan, and his deposition testimony, Scotty now swears in the affidavit that he sold Will the bike and delivered it to him in 2007. Will's affidavit is similar and his deposition testimony has been that he was in possession of the bike, but would not disclose its whereabouts. At least with respect to the Springer, Scotty's affidavit was "made to order," either by him or by one

---

[10]  *Sec. Nat. Bank v. Belleville Livestock Comm'n Co.*, 619 F.2d 840, 847 (10th Cir. 1979).

[11]  Scotty amended these no fewer than three times, but the references to the bike never changed.

Case 10-05035   Doc# 145   Filed 05/27/11   Page 6 of 24

of the Wilsons' respective counsel in this proceeding. Because the contradictions in Scotty's "sworn" testimony with regard to the bike are so blatant, they reflect on the affidavit's overall reliability. The Court deems Scotty's affidavit entirely unreliable and strikes it as a sham.[12]

Second, Will and Emma complain about the Bank's reliance on "unauthenticated" documents. While it is true that parties must support their factual contentions by citing to particular parts of the record and that responding parties may object that the supporting data "cannot be presented" in a form that would be admissible at trial, the Bank's supporting documents all appear to emanate from discovery or the court's file.[13] In any case, Will and Emma's objections concerning the lack of authentication do not state a basis for excluding the documents in question beyond pointing out what they believe to be misstatements or incorrect quotations from depositions.

### The Disputed Property

In its motion, the Bank posits that there are three classes of personal property whose ownership is in dispute: property that SWE claimed to own or control in its written statements to the Bank ("Expressly Represented Assets" or "SWE-owned"); property that somebody else claims to own, but of which SWE had free use ("Demonstratively Owned Assets" or "SWE-used"); and property that comprises the parts yard ("Parts Equipment"). Neither the Wilsons nor the Bank attempted to compare or conform these classes of property to those delineated in the Pretrial Order.[14] In that Order, the parties identified five property groups:

---

[12] Affidavits submitted in bad faith warrant sanctions under Rule 56(h) that include attorneys fees assessments and citations in contempt. The Court will consider what sanctions are appropriate and who their target should be after the trial in this matter. Both the Wilsons' attorneys and the Wilson parties should govern themselves accordingly.

[13] Fed. R. Civ. P. 56(c)(1) and (2).

[14] Dkt. 123, Adv. No. 10-5035; Dkt. 118, Adv. No. 10-5036.

-7-

1.    The "544 Property:" 18 pieces of rolling stock in which, according to the Trustee, the Bank has failed to perfect its security interests;[15]

2.    The "547/548" Property: 4 items that the Trustee and Bank claim Scotty transferred to Will either in payment of an antecedent debt or to defraud his creditors;[16]

3.    The "Venture Property:" 140 items of stock that, added to the "547/548 Property," comprise the assets of the alleged joint venture;[17]

4.    The "Springer:" one sought-after Harley Davidson bike as to which the parties have now apparently reached some form of compromise;[18] and

5.    The "Emma Property:"  6 items of equipment in Emma's possession that the Trustee and the Bank claim Scotty or SWE owns, but which Emma claims as her own (apparently exclusive of the various enterprises).[19]

As near as the Court can ascertain from comparing the two sets of lists, none of the "544 Property" except the Springer is included in any of the Bank's three groups.  The 547/548 property is contained in the SWE-owned list as is the Emma Property.  The Venture Property is all contained in the Parts list.  As the final statement of the issues in this matter, the Pretrial Order is the definitive statement of what property is in play at trial, except as modified by this Order.   The Court will

_____

[15] At oral argument, the Trustee and the Bank announced that they had reached a settlement concerning this property class.  As yet, no notice of intended compromise concerning this class of equipment has been filed.  *See* Dkt. 123, p. 7.

[16] *See* Dkt. 123, pp. 8-9.

[17] *See* Dkt. 123, pp. 12-17.

[18] Case No. 09-13250, Dkt. 190.

[19] *See* Dkt. 123, pp. 24-25.

Case 10-05035   Doc# 145   Filed 05/27/11   Page 8 of 24

therefore address the property as classified in the Pretrial Order and not in the Bank's response.

Many of the assets are vehicles that are or could be subject to certificates of title. Their provenance should be relatively easy to trace. With regard to the 544 Property, 17 of the pieces are trucks or trailers (except the motorcycle). Many of the trucks appear never to have had titles issued as the only exhibits offered by Will are certificates of title ("COT") that have been endorsed to him, but which do not refer to the Bank as lienholder. The same is true with the COTs produced by the Bank. On the summary judgment record, it is difficult to determine what the state of the vehicle titles may be. While many titles appear to have been signed over to Will, there are very few titles issued to any Wilson, leading the Court to question what manner of security interest the Bank claims and whether the Bank has a perfected security interest in any of this property. If the Bank's liens are not properly perfected, whatever property may be recovered in this action will become property of the two estates exclusive of the Bank's interest.

### The Uncontroverted Facts Regarding The Alleged Joint Venture

The Court addresses the uncontroverted facts regarding the alleged Venture Property below. First, however, several general statements are in order as to the uncontroverted facts bearing on the existence of an alleged joint venture among Scotty/SWE, Will and Emma.

The Wilsons, SWE, and WE all engage in the same line of business, collecting or acquiring vehicles, trailers, farm equipment, parts and scrap metal for salvage, and roll-off containers, with and without one another, and in variable combinations. When Bill was alive, he and Emma operated Wilson Enterprises. Bill and Emma pulled back from the Wilson Enterprises business in 1998 and Bill died in 2001. Will was active in the business and worked with or for his parents. Scotty formed SWE as a separate entity in 1998. Scotty has represented in personal financial statements submitted

Case 10-05035   Doc# 145   Filed 05/27/11   Page 9 of 24

to an unidentified bank that he owns 51% of a business venture and that Will and Emma own the other 49%.[20] This financial statement (Exhibit 19) is signed, but undated. Will denies any interest in SWE and Scotty denies this in his now-stricken affidavit, but, again, that written statement expressly contradicts one of Scotty's prior writings, casting a further shadow on his credibility.[21] Will and Emma are identified as officers of SWE in corporate documents. Will denies that he participates in the management of SWE and the record is devoid of evidence of his management of SWE other than being a named officer. Both Scotty and Will claim to have succeeded to the WE business when their father died. Scotty claims that he took over the excavation and earth-moving business from WE in 1998. Emma testified that Will succeeded to and operates the roll-off container business. It is disputed whether SWE and WE are one and the same business. Will contends that he took over the WE business as his sole venture and that SWE is Scotty's own sole venture. At the same time, Emma claims that the WE business was split between Will and Scotty but she retained ownership of the heavy equipment and dumpsters (roll-off containers) from the WE business and permits Will and Scotty to use the property in their respective businesses. In 2009, Will formed BKW Enterprises through which he operates his construction demolition, excavation, and salvage business. The Wilson parties have access to one another's property and use it with impunity. In the past, they have banked at various institutions. Indeed, they have each executed documents empowering one another to borrow on behalf of SWE and SWRP and to pledge entity

---

[20] The Court notes the lack of any financial statement that appears to be specifically addressed to Heritage. While that may not make much difference in this proceeding, the lack of a written representation as to property ownership would significantly undermine Heritage's § 523(a)(2)(B) exception to dischargeability case that is to be tried with this one.

[21] As noted above, that affidavit is stricken.

-10-

property as collateral.  Notably, the Bank has produced no such authorization in connection with Scotty's relationship there.  It is not controverted that the Wilsons cooperate in their business activities to some extent.

In connection with the Trustee's and Bank's joint venture claims, the Court finds the following additional facts are uncontroverted.  Emma wrote checks on SWE's account at the Bank and held herself out as SWE's secretary.  Will received most of his reported business income from SWE according to 1099s issued by SWE and Will's Schedule C attached to his tax returns over a series of years.  Whether or not Will intended to be in a joint venture with Scotty, he is an officer of SWE and SWRP and derives income from those entities.   These three individuals "work together," likely in individual business enterprises using each other's property.  There were no fixed salaries paid to Scotty, Will, or Emma.

Will charges losses associated with his business against his personal income and insures his own property.  SWE paid him for subcontracting work or for the use of the roll-off containers.  Will is permitted to salvage refuse materials collected from the roll-off containers.  There is a dispute over whether Will shares income or expenses of Scotty's business, though it is obvious on the record that some money flows between the two.  As noted above, Scotty and Will are officers of SWE along with Emma and, to that extent, he may have exercised some control over its affairs.

### *The Uncontroverted Facts Regarding Venture Property*

The Bank claims that approximately 140 items of personal property on the "Venture Property" list[22] are assets of the alleged joint venture between Scotty/SWE, Will and Emma.  The Bank attempted to controvert the statements of fact pertaining to 91 of these items with the

---

[22] *See* Dkt. 123, Pretrial Order, pp. 12-17.

following response to paragraph 223, as incorporated and repeated for each of these 91 items:[23]

> S. Wilson Enterprises, Inc., a family business enterprise, demonstrated its ownership in this asset by commingling it with other assets that the family business enterprise uses in business operations either as spare parts or to generate cash by scrapping the metal. See Heritage Bank's Statement of Uncontroverted Facts, paragraphs 1 to 24 and 41 to 51.[24]

This response is legally insufficient to adequately controvert the statements of fact to which it repeatedly refers for a number of reasons.

In responding to a movant's statement of uncontroverted facts, the opposing party is required to fairly meet the substance of the matter asserted. It is improper to make an additional assertion that does not *specifically* controvert the fact or meet the substance of the fact.[25] Here, instead of directly addressing the substance of movant's facts, the Bank deploys the statement quoted above which is nothing more than a conclusory assertion that an item of property is part of a "family business enterprise" called S. Wilson Enterprises and was owned by the family business enterprise because it was commingled with other unspecified assets of SWE used in business operations. By tagging a reference to 34 of the Bank's separate statements of uncontroverted fact as support for this conclusion, the Bank refers to different facts altogether and uses these facts to draw its own

---

[23] The 91 items of property to which the paragraph 223 response was made are identified by the number in the list of Venture Property contained in the Pretrial Order, as attached hereto as Exhibit A.

[24] Dkt. 100, p. 57, ¶ 223. The Court finds that the Bank's conclusory statement of ownership of property by commingling of assets with SWE property is not supported by the additional facts referenced. In any event, most of those additional facts asserted by the Bank are controverted by defendants.

[25] *See* D. Kan. Rule 56.1(a) and (e). *See also,* D. Kan. LBR 7056.1(a) and (e) as adopted for adversary proceedings in bankruptcy.

-12-

conclusions as to SWE's ownership.[26] Paragraph 223 concludes that the property in question is joint venture property even though the property in question was not purchased by the joint venture, was not contributed to the joint venture, and may not have been used in the joint venture. The paragraph simply posits the existence of the joint venture as a self-defined fact. This is not a proper controversion of the movant's statement of facts.[27]

To demonstrate that the Bank has failed to meet the substance of the facts asserted by defendants the Court gives this illustration using one of the 91 items of property: venture property item 22 – a 1981 Ford vehicle – beginning with defendants' statement of fact 394 and the Bank's response thereto.

> 394.  In July 1989 Bill and Emma purchased a Blue/Red 1981 Ford ½ ton VIN #1FTDF15E3BKA00253 from BRB for $900.

Bank's response: Uncontroverted.

> 395.  The title to the 1981 Ford reflects Bill and Emma as the purchase[r] with Nekon Bell Credit Union as a lien holder.

Bank's response: Uncontroverted.

> 396.  The 1981 Ford is no longer operational.

Bank's response: Uncontroverted.

---

[26] *See Carman v. CBE Group, Inc.,* ___ F. Supp. 2d ___, 2011 WL 1102842 at *1 (D. Kan. Mar. 23, 2011) (A nonmovant cannot avoid summary judgment by repeating conclusory opinions, allegations unsupported by specific facts, or speculation.).

[27] *See Raynor Mfg. Co. v. Raynor Door Co., Inc.,* 2009 WL 211942 at *3 (D. Kan. Jan. 27, 2009); *SOFCO, LLC v. National Bank of Kansas City,* 2009 WL 3053746 at *2 (D. Kan. Sept. 18, 2009) (Instead of tracking defendant/movant's statement of uncontroverted facts indicating those that are disputed and the reasons why, plaintiffs skip to Rule 56(b)(2) and set forth additional facts in separately numbered paragraphs purporting to satisfy the elements of a joint venture under Kansas law, with reference to the uncontroverted fact it purportedly disputes.).

-13-

397.    Scotty Wilson does not use the 1981 Ford.

Bank's response: Controverted.  See paragraph 223.

398.    Scotty did not pay for other [sic] otherwise contribute to the 1981 Ford's purchase.

Bank's response: Controverted.  See paragraph 223.

399.    Scotty has no right, title, claim or possession of the 1981 Ford.

Bank's response: Controverted.  See paragraph 223.

400.    Scotty has no lease interest in the 1981 Ford.

Bank's response: Controverted.  See paragraph 223.

401.    Scotty had no right to purchase the 1981 Ford.

Bank's response: Controverted.  See paragraph 223.

402.    Emma has possessed the 1981 Ford since its purchase at Will's farm.

Bank's response: Uncontroverted.

As this sequence of facts regarding the 1981 Ford painfully demonstrates, in one breath the Bank admits that Scotty's parents, Bill and Emma, purchased the vehicle in 1989, were titled owners of the vehicle, and that Emma (presumably after Bill's death in 2001) possessed the vehicle at Will's farm, and also contends in paragraph 223 that SWE "owned" this titled vehicle because it was "commingled" with other assets of SWE, a family business enterprise.  The summary judgment record is clear that Scotty was 22 years old in 1989 and did not form SWE until 1998.  Nowhere is it asserted that Emma transferred or otherwise contributed the 1981 Ford to SWE, that it was used in SWE's business operations, or that Scotty or SWE possessed the vehicle.  Moreover, the Bank does not specifically controvert Fact 397 and 398, instead relying on paragraph 223 which does not meet the substance of those factual statements.  It is simple, really.  Scotty or SWE either used the

vehicle or they did not. The Bank's response says neither. Scotty or SWE either helped pay for the purchase of the vehicle or they did not. The Bank's response says neither. In Facts 394, 395, and 402, the Bank admits that Bill and Emma purchased and owned the vehicle and that Emma has possession of the vehicle; but in response to Fact 399, the Bank disputes that Scotty has "no right, title, claim or possession" of the vehicle. In sum, the Bank's paragraph 223 response does not comply with D. Kan. LBR 7056.1(a) and (e). Each of the Bank's responses to Will and Emma's allegations concerning the other 91 items of personal property is identical in format and content and therefore legally insufficient. Because the Bank's responses are legally insufficient, the statements of facts concerning each of the 91 items are deemed admitted. It is therefore established for trial that none of the 91 items are "joint venture property" and their ownership is not in controversy at trial.[28]

In addition to these 91 items, the Trustee and Bank claim that the following Venture Property items are family business enterprise assets: item 73 - Massey-Harris Super 92 Combine; item 124 - 1985 International; and item 125 - 1984 Freightliner. As with the 91 items discussed above, this conclusory allegation is insufficient to controvert the Wilsons' statements of fact regarding these assets. Accordingly, these 3 additional items are not joint venture property and are eliminated from trial.

There are three items of Venture Property that have been returned to third-party lien holders or owners and are not claimed by Will or Emma here: item nos. 9, 43, and 127. Those 3 items are eliminated from trial of this matter.

Finally, item 1.A. – a 1986 Ford F350 – from the Venture Property list is not joint venture

---

[28] *See* Fed. R. Civ. P. 56(g). Also note that to the extent the Trustee's avoidance claims cover property on the "venture property" list, those claims and those items remain in controversy for trial.

property. It is uncontroverted that Will purchased the Ford and it is titled in him. Only Will uses the Ford in his construction and demolition business and personal use. Scotty does not use the Ford and did not contribute to its purchase. Scotty has no right, title, claim to or possession of the Ford. This item is eliminated from trial as it is uncontroverted that neither Scotty nor SWE have any interest in the Ford.

Thus, the total number of items from the Venture Property list that have been eliminated from trial is 98 of 140.[29] This leaves the following items from the Venture Property list in controversy at trial, but not because they are "joint venture" property. They remain in controversy because the Bank has sufficiently controverted the statements of fact with respect to these items and shown that Scotty or SWE has some interest in the assets by virtue of having purchased them, pledged them to the Bank, used them, or otherwise represented or demonstrated one or more indicia of ownership in them. Accordingly, these assets remain fair game at trial on the Trustee's claims for turnover or to determine the Bank's secured status in the same. These items are: 6, 7, 16, 41, 42, 44, 47, 60, 72, 81, 85, 106, 107 and 120 from the Venture Property list. Lastly, items 136, 137, 138, 139 and 140 from the Venture Property list appear to be duplicative of the Emma Property identified in the final Pretrial Order and remain at issue in this case, but not as joint venture property.[30]

---

[29] An itemization of those 98 items of Venture Property is provided in Exhibit A, attached hereto.

[30] It is unclear whether the 36 roll-off containers categorized as Emma Property are duplicative of the separately itemized roll-off containers on the Venture Property list: items 11, 12, 13, 27, 29, 30, 31, 32, 46, 51, 59, 68, 69, 70, 71, 75, 86, 87, 118, 128. In any event, the Court concludes that ownership of the roll-off containers remain in dispute and will be included in the trial of this matter. The summary judgment record shows that Scotty's cell phone number was affixed to the roll-offs and that he or SWE used them and generated substantial revenue from them (*i.e.*, Ferrell construction payments of over $100,000).

The Court next considers whether the uncontroverted facts, including the Bank's additional statements of uncontroverted fact submitted pursuant to D. Kan. LBR 7056.1(b)(2), are sufficient to support the Bank's joint venture theory.[31]  The inquiry on summary judgment is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."[32]  Of the Bank's 51 additional statement of uncontroverted facts, Facts 1-24 are categorized as facts supporting the existence of a joint venture.[33]  Defendants controvert most of the Bank's 24 additional facts.[34]

### *Analysis*

#### *The Alleged Joint Venture*

The Kansas Supreme Court has defined a "joint venture" as an association of persons with intent, by way of contract express or implied, to engage in and carry out *a single business venture* for profit.[35]  It may be done without formation of a partnership or a corporation.  The usual test is whether the parties intend to become partners or joint-adventurers.  The Kansas Supreme Court summarized Kansas law on joint ventures in *Modern Air Conditioning, Inc. v. Cinderella Homes, Inc.* as follows:

---

[31]  The Bank, apparently concluding that movant's 1,300 statements of uncontroverted fact are incomplete, asserted an additional 51 statements of uncontroverted fact.

[32]  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251-52 (1986).

[33]  Dkt. 100, pp. 5-11.

[34]  The Court notes that defendants' reply to the Bank's additional statements of uncontroverted fact is not much better than the Bank's response in terms of fairly meeting the substance of the fact asserted. *See* D. Kan. LBR 7056.1(c) and (e).

[35]  *Neighbors Construction Co., Inc. v. Seal-Wells Construction Co., Inc.* 219 Kan. 382, 385, 548 P.2d 491 (1976).

-17-

In sum, the cases indicate that a joint venture is an association of two or more persons or corporations to carry out a single business enterprise for profit; it may be found in the mutual acts and conduct of the parties. Among the acts or conduct which is indicative of a joint venture, but no single one of which is controlling in the determination, are: (1) the joint ownership and control of property; (2) the sharing of expenses, profits and losses, and having and exercising some voice in determining the division of the net earnings; (3) a community of control over and active participation in the management and direction of the business enterprise; (4) the intention of the parties, express or implied; and (5) the fixing of salaries by joint agreement.[36]

The party who asserts a joint venture bears the burden of proving its existence.[37] Yet, the Trustee's and the Bank's allegations in support of their joint venture claim are remarkably bare as to a number of these factors.

*Joint Ownership and Control of Property*

There is little or no showing of joint ownership of the "venture property." For instance, with respect to each and every one of the 91 items that the Bank asserts Scotty or SWE jointly owned with the other venturers, it is uncontroverted that the property was acquired or purchased by Bill, Bill and Emma, Bill and Will, or Will. The purchaser(s) in each instance were shown as the owners on the certificated title property (vehicles) or the bill of sale. Neither Scotty nor SWE were shown as a purchaser or joint owner of such property. While Scotty has occasionally represented on financial statements that SWE or some unidentified venture is owned between him at 51% and Will and Emma at 49%, Will disputes that he has any ownership interest in SWE or other venture with Scotty. Nor is there any representation that this property was "contributed" or transferred to a single business enterprise for all to use. Nor does it appear that the Wilsons exert "joint control" over the

---

[36] 226 Kan. 70, 76 (1979).

[37] *Flight Concepts Ltd. Partnership v. Boeing,* 819 F. Supp. 1535, 1547 (D. Kan. 1993).

-18-

Venture Property. At most, the summary judgment record shows that with respect to some of the Venture Property," Scotty and Will were granted permission or access to use the property by Bill, Emma or Will. The summary judgment record does not support a finding of joint ownership and control.

### *Sharing of Expenses, Profits and Losses*

Nor does the  summary judgment record show sharing of expenses, profits and losses. At best, the Court can conclude that Will is paid by SWE or Scotty for the use of the Venture Property or as a subcontractor working for Scotty. Will claims those payments as income to his business. SWE issued a Form 1099 to Will, who files a separate tax return. While Scotty or SWE may have generated revenue from the use of some of the Venture Property (i.e. the roll-off containers), there is no indication of distributions, as the Court understands that term, from the income generated from the Venture Property among the alleged venturers.

### *Community of Control Over and Active Management of the Enterprise*

Scotty, Will and Emma are officers of the corporate debtor SWE. But apart from Emma's check signing authority, nothing suggests that Will or Emma were actively engaged in managing SWE's business. The parties have used some of the Venture Property at times, but this does not necessarily establish a community of control. As noted previously, Will and Emma freely granted permission for SWE or Scotty to use property. And SWE has paid Will for work he performed with or for Scotty. Neither fact, however, is sufficient for this Court to find a community of control over the enterprise by Emma, Will, and Scotty. The parties clearly have worked together or worked in the same line of business and have done so most of their adult lives. That perhaps makes them a family that works together, but does not establish a community of control over a single business

-19-

enterprise.  Nothing in the record reflects active management of the enterprise.

<em>Fixing of Salaries by Agreement</em>

The Bank concedes that there are no fixed salaries for Scotty, Will or Emma.  Nor is there a summary judgment record establishing this joint venture factor.

<em>Intention of the Parties</em>

The record does not reflect or support the existence of an agreement among Emma, Scotty, and Will to create a joint venture.  From all appearances, the uncontroverted facts do not evidence the parties' intent to carry out a single business enterprise.  Indeed, it appears to the Court that Will and Scotty carry on separate (and multiple) business enterprises.  Indeed there is controversy about whether Will or Scotty, or both, continued the family business known as Wilson Enterprises upon their father's death in 2001.  There is evidence that Will worked alongside Bill in the family business prior to his father's death.  Scotty formed a separate business enterprise SWE in 1998. While Will and Scotty were engaged in a similar *type* of business enterprise, the Court cannot conclude that they carried on a *single* business enterprise or what that single business enterprise was called.  The summary judgment record suggests that Scotty and Will maintained separate business records and accounts.  The record is devoid of all of the parties jointly owning and controlling all of the alleged Venture Property.  That the parties allowed each other to use the Venture Property in their separate businesses does not establish an intent to create a joint venture.

In short, none of the five factors for a joint venture is demonstrated.  Giving the nonmovants the benefit of all reasonable inferences, the Court finds that the Trustee and the Bank fall far short of supporting the existence of a joint venture among Emma, Will, Scotty and/or SWE and that a rational trier of fact would be incapable of concluding that a joint venture existed between the parties

-20-

on this sparse record. Therefore, the Wilsons' motion for summary judgment must be granted on the joint venture theory.

Before leaving the "venture property" and joint venture theory, the Court makes clear that the Trustee's and Bank's joint venture theory is eliminated from trial of this matter, as are the allegations that the 98 items of Venture Property identified in this Order are either property of the estate or subject to the Bank's security interests. The balance of the Venture Property, to the extent that the Trustee may recover it as property of the estate and avoid any Bank's lien in it, remains in controversy at trial. The Bank has shown enough of Scotty's or SWE's "fingerprints" with respect to this remaining Venture Property to get past summary judgment. This includes the roll-off containers[38] as well as those assets which Scotty claims as an asset of SWE or granted a security interest in to the Bank.[39]

As a consequence of this Order, the causes of action that remain for trial are:

1.  The Trustee's lien avoidance claims to the "§ 544 Property;"

2.  The Trustee's avoidance claims to the "§§ 547 and 548 Property;"

3.  The Trustee's turnover claims and the Bank's determination of secured status claims as to those items of Venture Property that are not included in the 98 items as to which summary judgment is granted today[40] and the Emma Property as described in the Pretrial Order.

***Going Forward***

---

[38] Items 11, 12, 13, 27, 29, 30, 31, 32, 46, 51, 59, 68, 69, 70, 71, 75, 86, 87, 118, 128 and 140 of the Venture Property List in the Pretrial Order.

[39] Items 6, 7, 16, 41, 42, 44, 47, 60, 72, 81, 85, 106, 107 and 120 of the Venture Property List in the Pretrial Order.

[40] The remaining Venture Property items are listed on Exhibit B, attached hereto.

In an effort to direct the parties toward a trial presentation that is both effective and economical, the Court makes the following comments. First, nowhere in the Bank's 540 page response to this motion did it even outline the details of its contractual relationship with Scotty and SWE. What is owed by whom and what was pledged as collateral remains to be shown in this case. Likewise, it is not clear from the Trustee's papers what the factual predicate for his avoidance and turnover claims is.

With respect to the issues surrounding the ownership of equipment and the attachment and perfection of the Bank's security interests in it, the parties shall proceed as follows.

The documentary evidence concerning the various items and their ownership, should be organized into groups corresponding with the classes of property listed in the pretrial order (544 Property, 547/548 Property, Emma Property, and Venture Property). The parties are to cooperate in the assembly of notebooks, one per classification, containing tabbed exhibits that are grouped in the same order that the properties are listed in the Final Pretrial Order. In addition, those exhibits are to be presented in tabbed digital format for use at trial and in chambers. The Court notes that at oral argument of this summary judgment motion, counsel represented that they were near stipulation or resolution with respect to the 18 items of 544 Property. **Council shall have 21 days from the entry of this Order to memorialize the same and submit it to the Court.**

Second, the parties should focus on the state of title documents and related filings (such as NOSI or applications for secured title and bills of sale for non-titled equipment). The Court considers these records to be highly persuasive as to ownership of personal property and the attachment and perfection of security interests in it. In addition, the Bank should be prepared to demonstrate that it properly perfected its liens in the property. If it cannot document the attachment

and perfection of its security interests, those liens may be avoided and preserved for the benefit of the estate. Likewise, if the Trustee and the Bank cannot document title ownership in SWE or Scotty on their respective petition dates in a titled vehicle or one that is subject to a bill of sale, such assets are unlikely to be found property of either of the bankruptcy estates.

Third, many of the items of property listed in the motion papers appear to have little value in relation to the Bank's claim, even taken in the aggregate. All of the parties should carefully weigh the expense they will incur in preparing to try this case against the value of this property and consider whether there is a better way to resolve their disputes.

In light of the rulings contained in this Order, the necessary time of trial may be reduced to four days. **Trial is therefore set for July 25-28, 2011, commencing at 9:00 a.m.** The Trustee and the Bank will each have one and one-half days to present their case in chief (including cross-examination).[41] The Wilsons will have one and one-half day to do likewise. Rebuttal and closings will be concluded on the fourth and final day of trial. Trial time being at a premium, the parties are encouraged to adopt an organized and thoughtful approach to this trial. Attempting to prove "everything" may result in failing to prove anything.

A final pretrial conference will be held **Thursday, July 14, 2011, at 1:30 p.m.** in the courtroom. Exhibits shall be exchanged and will be due to the Court on or before **July 20, 2011.**

The Wilsons' Motion for Summary Judgment is GRANTED IN PART as set out above and the Final Pretrial Order deemed amended consistent with this Order.

---

[41]   The Bank will also present its case-in-chief on its dischargeability claim in Adv. No. 10-5038 during its allotted trial day. Scotty will have part of the Wilsons' one and one-half case-in-chief days to present his defenses to that claim. The parties are to decide among themselves how to divide that time; if the Court's assistance is necessary, the parties should advise the Clerk accordingly.

\# \# \#